ENTERED AUG 2 9 2014

STATE OF MAINE

BUSINESS AND CONSUMER COURT

Cumberland, ss.

AMH-CUM-04-11-14

ROBERT L. KIMBALL, BRIDGTON HOSPITAL, RUMFORD HOSPITAL, MAUREEN HARPELL, N.P., ALBERT ANIEL, M.D., DAVID SALKO, M.D., BRENDA WEEKS, JULIE RIOUX, LISA PEASE, CENTRAL MAINE HEALTHCARE CORPORATION, CENTRAL MAINE MEDICAL CENTER, DIETER KRECKEL, M.D., ALAN VERRILL, M.D., WILLIAM LEE, M.D., DANIEL TRAFFORD, and JOHN DOE and MARY ROE, unknown individuals,

Petitioners

v.

Docket No. BCD-AP-13-05

SUPERINTENDENT OF INSURANCE and BUREAU OF INSURANCE, DEPARTMENT OF PROFESSIONAL AND FINANCIAL REGULATION, STATE OF MAINE

Respondents

and

ANTHEM HEALTH PLANS OF MAINE,

Party in Interest

## DECISION ON APPEAL

Pursuant to M.R. Civ. P. 80C, Petitioners appeal from the Amended Decision and Order of the Respondent Superintendent of the Maine Bureau of Insurance, approving, with conditions, a provider access plan proposed by Party in Interest Anthem Health Plans of Maine, Inc. ("Anthem") for Anthem's Guided Access HMO health insurance products.

Anthem is one of the two health insurers that presently offer plans on the Affordable Care Act ("ACA") individual exchange for Maine. Anthem's ACA products

for ten northern Maine counties are called Guided Access POS plans, and its ACA products for six southern Maine counties are called Guided Access HMO plans. Only the access plan for Anthem's Guided Access HMO products is at issue in this appeal. [1]

In his Amended Decision and Order [hereinafter "Amended Decision"], the Superintendent of Insurance determined that Anthem's proposed Guided Access HMO network of healthcare providers would, upon fulfillment of specified conditions, provide reasonable access to healthcare services under the Insurance Code (24-A M.R.S. §4303) and Insurance Regulations (Insurance Rule Chapter 850(7)).

The Petitioners include Anthem subscribers who claim they may be adversely affected by the approval of the proposed Guided Access HMO provider network, as well as hospitals and individual health care providers that are excluded from the provider network.

In their brief on appeal, Petitioners contend that the outcome of the proceeding was materially affected by a bias favoring Anthem's Guided Access plans on the part of the Superintendent, and base their assertion in part on statements made by or on behalf of the Superintendent before the hearing began. Also, Petitioners assert that the Superintendent failed to provide notice to the public and other interested parties pursuant to the Administrative Procedure Act ("APA"); that the Superintendent made several errors of law before, during, and after the hearing that materially affected the decision; that the conduct of the proceeding was unfair and violated due process and the APA; that the Superintendent erred as a matter of law in determining that, even with conditions, Anthem's proposed Guided Access HMO access plan comports with 24-A

---

[1] The Amended Decision addressed Anthem's Guided Access POS access plan as well as the Guided Access HMO access plan, see R. 2:2640 (Amended Decision at 59), but the former is not at issue.

M.R.S. §4303(1) and Insurance Rule Chapter 850(7); and that he erred in denying a motion to stay in the proceedings.

This Decision on Appeal addresses all of those contentions. The underlying facts are largely undisputed, and the parties have agreed on a voluminous certified record. What factual disagreements there are among the parties arise primarily focus on what inferences should be drawn from undisputed facts.

I. *Parties*

A. The Petitioners:

The Petitioners identify themselves as follows in the Petition:

- Rumford Hospital in Rumford, Oxford County, is a Critical Access Hospital that serves fourteen contiguous towns as the sole hospital; and the approved Guided Access plans would exclude Rumford Hospital as well as all 14 primary care physicians ("PCP") who practice in Rumford and in those fourteen towns. Rumford Hospital also offers specialty clinics that are available only at Rumford Hospital in Oxford County.

- Bridgton Hospital is a Critical Access Hospital in Bridgton, northern Cumberland County, that serves seventeen contiguous towns; and the approved Guided Access plans would exclude Bridgton Hospital and 19 of the 20 PCP's who practice in Bridgton and those seventeen towns. Bridgton Hospital also offers specialty clinics that provide services available in that area only at Bridgton Hospital.

- Central Maine Medical Center (CMMC), located in Lewiston, Androscoggin County, is one of only three tertiary care hospitals in the state of Maine, and is the only tertiary care hospital located in Androscoggin, Oxford and Franklin counties. The approved Guided Access plans would exclude CMMC and more than 200 physicians, including 72 PCP's, employed by CMMC.

- All three hospital Petitioners are owned by Petitioner Central Maine Healthcare Corporation (CMHC), a nonprofit corporation that provides an array of healthcare services under the name Central Maine Medical Family. *See* www.cmmf.org

- Maureen Harpell, N.P. is a nurse practitioner practicing in Cumberland County. Alan Verrill is a primary care physician practicing in Cumberland County. William Lee, M.D. is a primary care physician practicing in Androscoggin County. Albert Aniel, M.D. and Dieter Kreckel, M.D., are primary care

3

physicians practicing in Oxford County. David Salko, M.D. is a primary care physician practicing in Sagadahoc County. All of the individual health-care provider Petitioners have established provider-patient relationships with individuals who are covered by other Anthem individual or small group plans, and all are participating providers under those plans. However, all of them are excluded from the provider networks in the Guided Access plans approved by the Superintendent.

- Robert Kimball, Brenda Weeks, Julie Rioux, Lisa Pease and Daniel Trafford are individual residents of Cumberland, Androscoggin and York Counties who are or were subscribers under Anthem individual or small group health plans. They assert that they are affected by the approval decision at issue in this appeal because their PCPs are excluded from the provider networks of the Guided Access plans, and/or the hospitals that they have used as a matter of choice and convenience are excluded. They allege that they may be adversely affected by the approval of the Guided Access plans because they may have to travel substantial distances for medical and hospital services as a result.

- Petitioners John Doe and Mary Roe are alleged to be unknown individual subscribers to Anthem health plans who did not get notice of the proceedings culminating in the Guided Access approval decision at issue, and who may be adversely affected by the approval decision because their PCPs are excluded from the provider networks of the Guided Access plans, and/or the hospitals that they have used as a matter of choice and convenience are excluded. They allege that they may be adversely affected by the approval of the Guided Access plans because they may have to travel substantial distances for medical and hospital services as a result.

Among the Petitioners, Rumford Hospital, Bridgton Hospital, individual physicians/providers Albert Aniel, David Salko, Maureen Harpell, and individual subscribers, Brenda Weeks, Julie Rioux, and Lisa Pease, intervened in the administrative proceeding that culminated in the Guide Access approval decision. They are referred to below as "the Intervenor Petitioners."

Central Maine Healthcare Corporation (CMHC), Central Maine Medical Center (CMMC), individual physicians Dieter Kreckel, Alan Verrill and William Lee, and petitioner Daniel Trafford, did not intervene in the proceeding below, but filed a motion to stay the proceeding, which was denied.

4

Petitioner Robert Kimball asserts that he did not receive timely notice of the proceeding, and that because the contents of the Anthem application were withheld from the public, he could not determine what effect it would have on him in time to participate meaningfully in the proceeding. Petitioners allege that others, named herein as John Doe and Jane Roe, are situated similarly to Mr. Kimball.

B. Respondents Superintendent and Bureau of Insurance

Pursuant to statute, the Maine Superintendent of Insurance is the head of the Maine Bureau of Insurance. 24-A M.R.S. § 201. The Superintendent's statutory authority includes reviewing all proposed individual and small group health insurance products to be sold in Maine to ensure they comply with applicable provisions of the Maine Insurance Code relating to, among other things, covered benefits, contract terms, premium rates, and—most relevant here—access to health care services. *See, e.g.*, 24-A M.R.S. §§ 2701–2768, 2808-B, & 4303(1).

C. Party in Interest Anthem Health Plans of Maine

Anthem is an insurance carrier that is licensed in Maine to offer a variety of individual and group health insurance plans, including the two Guided Access plans that are the subject of this appeal.

## II. *Background*

A. The Federal Affordable Care Act

Effective January 1, 2014, the federal Patient Protection and Affordable Care Act, P.L. 111-148, (the "ACA"), sets standards in terms of covered benefits and out-of-pocket costs for most individual and small-group health plans sold in the U.S. Health insurance coverage purchased before March 23, 2010 is grandfathered from the ACA requirements. However, the ACA requires those with more recently acquired coverage,

5

as well as most uninsured Americans, either to obtain conforming health coverage or to pay a substantial penalty, amounting to at least 1% of income in 2014, and rising to at least 2.5% of income in future years. 26 U.S.C. § 5000A.

In order to help Americans afford mandatory coverage, the ACA offers federal subsidies to those earning less than four times the federal poverty level (about $94,000 per year for a family of four). *See* 26 U.S.C. § 36B. However, federal subsidies are available only for the purchase of coverage under policies certified as "qualified health plans" or QHPs. *Id.* § 36B(b)(2). A QHP certification indicates that the policy meets certain quality standards above and beyond the minimum standards applicable to all policies sold after March 2010. *See* 42 U.S.C. § 18031(c). To obtain federal subsidies, consumers must purchase a certified QHP, and, further, must do so through a "marketplace" run by the federal government (sometimes also called an "exchange"), accessed primarily via www.healthcare.gov.

Because the ACA generally does not preempt state insurance regulation, Maine carriers wishing to offer QHP plans on the marketplace had to obtain, in addition to federal QHP certification, all approvals required under the Maine Insurance Code, Title 24-A of the Maine Revised Statutes, (the "Code"). *See* 42 U.S.C. § 18041(d). Because online access to the exchanges via healthcare.gov was scheduled to be available to consumers beginning October 1, 2013, the federal agency responsible for overseeing the start-up of the ACA, the Center for Medicare and Medicaid Services (CMS), set deadlines designed to ensure that proposed QHPs would be ready for sale by October 1.

The Superintendent understood there was a July 31, 2013 deadline for him to review and decide whether to approve any proposed QHPs for Maine, and to forward to CMS the final state-reviewed QHP plan data with a recommendation on whether the

6

QHPs proposed for Maine should be certified by CMS. *See* R. 2:2180, 2434.[2] The Superintendent also treated the July 31 deadline as firm, in that any proposed QHP that had not been recommended for certification by CMS's July 31, 2013 deadline was at risk of not being certified as a QHP by the October 1, 2013 date by which the online ACA exchanges were scheduled to be available to consumers. *See* R. 2:2214, 2434.

The record does not appear to include any actual communication from CMS setting the July 31, 2013 deadline for state regulators to review and, if they so decide, to recommend QHPs for certification, although the Respondents' brief on appeal cites to an April 5, 2013 guidance letter from CMS setting such a deadline. *See* Rule 80C Brief for Respondents Superintendent of Insurance and Bureau of Insurance at 5. However, it is clear that the Superintendent understood the deadline to be firm, *see* R. 2:2214, 2218, 2434. Although Petitioners question whether the July 31 deadline was as firm as the Superintendent believed, Petitioners' brief does not deny that the deadline existed. Hence, this Decision on Appeal does not treat the existence or firmness of the deadline as contested issues on appeal.

B. Anthem's Proposed "Narrow Network" Access Plans

In late April 2013, Anthem filed a QHP application seeking to offer two sets of products in Maine on the federal ACA exchange for Maine. For six northern and eastern Maine counties—Aroostook, Hancock, Washington, Penobscot, Piscataquis and Somerset—Anthem proposed a set of point-of-service HMO products collectively called the "Guided Access POS" plan. R. 2:2166. For the remaining ten Maine counties,

---

[2] This and similar citations are pin cites to the Certified Record filed in this case. Citations are in [binder number]:[record page] format. Thus, "R. 2:2214" refers to the page stamped 2214 in the lower right corner that is inside the binder labeled Binder 2.

Citations to the transcripts of the June 28 and July 2 hearing sessions are in [binder number]:[hearing date]:[transcript page]:[line] format. *E.g.* R. 5:6/28:195-96.

Anthem proposed a set of traditional HMO products called the "Guided Access HMO" plan. *Id.* Only the Guided Access HMO products are at issue in this appeal.

Anthem could not offer the Guided Access HMO or Guided Access POS products to the public without the approval of the Superintendent of Insurance. By Bureau rule, all carriers seeking to offer managed care plans in Maine, including HMO plans, must file "access plans," which must disclose the proposed plan's provider network as well as other information needed by the Superintendent to assess whether the plan will provide "reasonable access to health care services." *See* 24-A M.R.S. § 4303(1); 02-031 C.M.R. ch. 850, § 7(A) ("Rule 850") R. 7:6125).

Anthem submitted its proposed access plans for its Guided Access HMO products as well as its Guided Access POS products by letter dated May 31, 2013. R. 1A:1–2; 1B:624-25. The proposed access plan for the Guided Access HMO products consisted of four main parts: (1) an 11-page application form, R. 1A:3–13), (2) a list of participating providers, R. 1A:14–514) (3) samples of provider contracts, R. 4:5868–5917), and (4) a series of "managed care accessibility analyses" comparing the geographic distribution of Anthem's membership against that of various types of participating providers, R. 1A:515–623).

Anthem's proposed access plan for the Guided Access HMO products featured a "narrow" provider network that excluded, among others, six southern Maine hospitals, including the three hospital Petitioners in this appeal, and hundreds of physicians and other individual health care providers who currently participate in networks for other Anthem plans and provide medical services to Anthem subscribers. In contrast, Anthem's access plan for its Guided Access POS products proposed a "broad network," encompassing nearly all providers in the six counties in which those products would be

8

offered. See R. 2:2583. Anthem's proposed broad network for the Guided Access POS products did not raise comparable questions regarding reasonable access.

Among the Petitioner hospitals, Anthem's Guided Access HMO "narrow network" excludes Rumford Hospital, Bridgton Hospital, and Central Maine Medical Center, the only tertiary care hospital located in Androscoggin, Oxford and Franklin counties. The proposed network excluded more than 200 physicians, including 72 PCPs, employed by CMMC in Androscoggin County. In addition to the Petitioner Hospitals, York Hospital, Mercy Hospital and Parkview Adventist Medical Center were excluded from the proposed Anthem Guided Access HMO "narrow network."

The exclusion of six hospitals and hundreds of individual providers from Anthem's "narrow network" for the Guided Access HMO products has obvious significant implications for both the excluded providers and the consumer who elect coverage under the Guided Access HMO plan.

As part of its justification for the "narrow network," Anthem was required to project enrollment in its proposed Guided Access HMO plans—a daunting task given the new health insurance landscape created by the ACA and the uncertainties associated with that landscape. Anthem projected that about half of its current individual members and subscribers would be eligible to maintain coverage under grandfathered plans, and the rest would not. R. 5:6/28:195-96. However, because enrollment in the Guided Access plans likely would include people new to Anthem, Anthem's projection assumed enrollment in the Guided Access HMO plans equal to its entire individual and small group membership of 40,385 persons. R. 1A:5.

The cover letters under which Anthem submitted its access plans for the Guided Access HMO and Guided Access POS products designated its entire access plan filing

9

as confidential. Each letter indicated in pertinent part, "Anthem is asserting confidentiality with respect to this letter itself and of its existence and additionally, we are asserting the confidentiality of the filing in its entirety and request that the filing be afforded confidential treatment until after its approval." R. 1A:1, 1B:624. The stated basis for Anthem's blanket claim of confidential status was that "the filing in its entirety consists of trade secret information protected from disclosure under 1 M.R.S.A. § 402(3)(B) and Maine Rule of Evidence 507 (Trade Secrets)."

Although Anthem's assertion of confidentiality was justified as to portions of its access plan filing and colorable as to others, Anthem's blanket assertion of confidentiality for the entire filing, extending to the very existence of the cover letter, was an overreach. Anthem's over-designation of confidential material plainly impeded public disclosure of a filing that by any measure was of substantial public concern.

C. The Bureau of Insurance Procedure For Reviewing Anthem's Application

After reviewing Anthem's Guided Access HMO access plan, the Superintendent decided, on his own initiative, to convene a formal administrative proceeding, later captioned *In re: Anthem Blue Cross and Blue Shield Request for Approval of Access Plans*, Docket No. INS-13-801, to determine whether Anthem's proposed access plans would provide subscribers with "reasonable access to medical services" as required by statute and the Bureau's regulations. R. 2166-68; see 24-A M.R.S. § 4303(1); 02-031 C.M.R. ch. 850, § 7(A).

The Bureau and Anthem note that the Superintendent was not required to hold a formal hearing on Anthem's access plan proposals. This was true when he decided to hold the hearing, because no request for a hearing had been made as of that date. Section 229 of the Maine Insurance Code permits the Superintendent to hold a hearing

10

on his own initiative, but the same section statute requires the Superintendent to hold a hearing "[u]pon written application for a hearing by a person aggrieved by any act or impending act, or by any report or order of the superintendent . . ." 24-A M.R.S. § 229(1), (2)(B). Had the Superintendent not convened a hearing *sua sponte*, there undoubtedly would have been a request for hearing filed by some person claiming to be aggrieved, such as any of the Petitioners.

The Superintendent issued a Notice of Pending Proceeding and Hearing, dated June 5, 2013, (the "Notice") describing the nature of Anthem's proposal and identifying the regulatory framework that the Superintendent intended to apply in reviewing the proposal. R. 2:2166-68. The Notice set June 12, 2013 at 3 p.m. as the deadline for Petitions to Intervene[3], and it set the hearing for June 28, 2013. *Id.* Although the hearing date was little more than three weeks after issuance of the Notice and less than that from when the Notice was actually published, the interval before hearing was still more than the 14-day minimum set by statute, *see* 24-A M.R.S. § 230(2).

On June 6, the Superintendent sent the Notice to counsel for Petitioners in this case. R. 2:2584–85.) Also on June 6, the Superintendent provided the Notice to the Maine Medical Association and the Maine Hospital Association, trade groups representing the interests of Maine's doctors and hospitals respectively. *Id.* The Superintendent posted the Notice on the Bureau of Insurance's public website, and also sent the Notice to five general circulation daily newspapers for publication. Of the four

---

[3]  The June 12 deadline for intervention was not an absolute deadline; the Notice allowed for petitions to intervene filed after the deadline to be granted upon a showing of "good cause." R. 2:2167. The Superintendent's subsequent June 12 procedural order clarified that post-deadline petitions would be allowed "upon a compelling showing of good cause." R. 2:2180. However, all of the petitions to intervene that were filed were timely and all of them were granted. There is no evidence that the Superintendent's June 12 deadline, tight as it was, actually deprived anyone who wanted to intervene of that opportunity.

daily newspapers in the ten counties encompassed by Anthem's Guided Access HMO filing, the *Portland Press Herald* and Lewiston Sun Journal published the Notice on June 12 and 13, and the *KENNEBEC JOURNAL* and *Morning Sentinel* published it on June 13 and 14. *Id. See* 5 M.R.S. § 9052(3)(B) (requirement to publish in a newspaper "in the area of the state affected").[4]

During the one-week interval between the issuance of the Notice and the deadline for petitions to intervene, the Superintendent kept Anthem's access plan filings confidential at Anthem's request, pending his review of the filings to determine whether they qualified for confidential treatment.

On June 11, 2013, some of the Petitioners, including CMHC and its affiliate hospital, CMMC, filed a Motion for Stay, seeking to stay the proceeding that the Superintendent had instituted, including the intervention deadline and the hearing, "until a reasonable time after all public records relating to the proposed Anthem plans have been made available to the public, and the Applicants and other potentially interested and affected persons have had an opportunity to review the public records and make a determination whether to intervene in this proceeding." R. 2:2205-09.

None of the Petitioners that filed the Motion for Stay sought to intervene in the proceeding, and none of the Petitioners that sought to intervene joined in the Motion for Stay. (The Petitioners who sought leave to intervene are hereinafter called "the Intervenor Petitioners" and those who did not are called "the non-Intervenor Petitioners"). The only intervenor in the proceeding that requested a stay was York

---

[4] The fifth general circulation newspaper, the BANGOR DAILY NEWS, did not publish the notice until June 17 and 18, but that newspaper is not in the area of the state affected by the Guided Access HMO products at issue here.

Hospital, which filed a Motion to Stay on June 12, 2013. R. 2:2216-2217. That motion was denied June 13, 2013. R. 2:2218-2219.

Also on June 11, the Superintendent issued an Order Clarifying The Scope of Hearing to resolve an ambiguity created by the fact that Anthem submitted its Guided Access HMO access plan filings on Bureau of Insurance forms intended to be used for initial registration of preferred provider arrangements (PPAs). R:2:2175-76; *see also* R. 1A:3 (Anthem's filing).[5] Under the Insurance Code, proposed PPAs are subject to network adequacy standards different from those applicable to proposed HMO provider networks. *Compare* 24-A M.R.S. § 2673-A (PPA standards) *with* 24-A M.R.S. § 4303(1) (HMO standards).

The Superintendent's Order Clarifying the Scope of Hearing confirmed that the proceeding and hearing would focus on "whether Anthem's proposed networks meet adequacy standards applicable to HMOs, including 24-A M.R.S. § 4303(1) and Insurance Rule 850(7)." R. 2:2176. The Order also indicated that, based on Anthem's filings, "the provider networks proposed by Anthem need not be approved as PPAs to be used with the Guided Access HMO or the Guided Access POS products." *Id.*

The next day, June 12, 2013, some of the Petitioners, including CMHC's other affiliate hospitals Rumford Hospital and Bridgton Hospital, filed a petition to intervene in the proceeding. R. 2:2200-03. Petitions to Intervene were also filed by York

---

[5] The Order Clarifying the Scope of Hearing responded to a June 10, 2013 letter from Petitioners' attorney, writing on behalf of unspecified clients, "request[ing] clarification" that the proceeding just initiated "is being held solely to determine whether the proposed Anthem plans identified in its May 31, 2013 filing, meet network adequacy requirements (specifically under 24-A M.R.S. § 4203(3), § 4303(1) and Chapter 850(7) of the Insurance Rules." R. 2:2160. Attorney Poulin's letter also sought confirmation that "this proceeding and hearing are not being held to determine whether the proposed Anthem plans identified in its May 31, 2013 filing meet the requirements of the Preferred Provider Arrangement Act (24-A M.R.S. § 2673-A and Insurance Rule Chapter 360)." *Id.*

13

Hospital and Mercy Hospital, and by the Maine Attorney General's Office. R. 2200-03, 2194, 2196-97, 2198-99.

June 12 was a busy day for the Superintendent. On that day, he denied the Motion for Stay filed by the non-Intervenor Petitioners, R. 2:2210-15; granted all of the petitions to intervene that had been filed, R. 2:2204; ordered that a portion of Anthem's filing be made public; entered a protective order allowing for intervenors' counsel to obtain "eyes only" access to the rest of Anthem's filings, R. 2:2188-93; and issued a procedural order setting further dates and deadlines for parties to the proceeding to take discovery and to prefile their proposed testimony and exhibits for the June 28 hearing.

In denying the motion to stay filed by some of the Petitioners, the Superintendent noted that, as non-parties to the newly instituted proceeding, the movants lacked standing to seek to delay it. He also pointed out that granting a stay would likely delay the hearing on Anthem's proposed access plans until July 21, too close to the CMS deadline of July 31, 2013 for states to submit QHP recommendations, and also that the movants could achieve their goal of learning more about Anthem's plans by petitioning to intervene. R. 2:2210-15.

The Superintendent's June 12 protective order appears to reflect an effort to balance Anthem's confidentiality interest against the intervenors' right to effective participation in the proceeding and the public's right of access to non-confidential material. The Protective Order provided for the initial registration forms, totaling 11 of the 663 pages of Anthem's Guided Access HMO access plan filing, to become public June 13, 2013, although the remaining 652 pages of that filing were provisionally designated as "attorneys eyes only". R. 2:2188-89. The "attorneys' eyes only"

14

designation meant that counsel for all intervenors could review Anthem's entire access plan filing, but could not share or disclose the contents of Anthem's filing other than the 11 pages with anyone else. Petitioners make a valid point that, because they could not share or disclose the contents of Anthem's filing with the hospital and health care professionals with whom Petitioners' counsel were working, Petitioners could not prepare for the hearing as thoroughly as they could have otherwise.

Two points in response are worth noting. First, the Petitioners have not shown that the limitations on access imposed by the Superintendent in fact caused any specific prejudice to their ability to participate effectively in the proceeding. Second, beginning the same day, June 12, the Superintendent began to release portions of Anthem's filing from confidential status, allowing access by the public.

Paragraphs 4 and 5 of the Superintendent's June 12, 2013 Protective Order also established a process for any party to challenge the designation of any material as "confidential" or "attorneys' eyes only," by filing a motion to undo the designation, and a separate procedure for anyone other than parties to challenge the designation. R. 2:2189. The challenge procedure in both instances included a very limited window of opportunity for Anthem to contest the release of any material before the release occurred. *Id.* at 2189, 2191.

On June 13, 2013, pursuant to the challenge procedure in the Protective Order, another intervenor, the Maine Attorney General, filed a Motion for Immediate Public Disclosure of attachments 1, 2 and 3 to the Anthem access plan filing, which constituted lists of the individual and hospital providers in the proposed "narrow network", referred to as "Provider Network Lists". R. 2225-26. Anthem opposed the Attorney General's motion on the grounds that the "narrow network" was confidential trade secret

15

information, and the public did not need to know what providers were in the network. R. 2:2227-34. By Order dated June 17, 2013, the Superintendent overruled Anthem's objection, granted the motion, and ordered the release of the Provider Network Lists to the general public, including Petitioners, effective June 18, 2013. R. 2235-37.

On June 18, 2013, Anthem filed updates to its proposed provider lists for the Guided Access HMO and Guided Access POS networks.

On June 20, 2013, the Intervenor Petitioners propounded their initial discovery requests upon Anthem. R. 2:2285-88.

Also on June 20, 2013, the Superintendent issued 12 subpoenas for testimony at the June 28 hearing at the request of the Intervenor Petitioners, directed to Anthem and several hospitals in the proposed Guided Access HMO "narrow network," as well as individuals affiliated with those entities. Anthem and some of those to whom the subpoenas were directed moved to quash 11 of the 12 subpoenas (the other of which having been withdrawn), and the Intervenor Petitioners opposed the motions. *See* R. 2:2360-2422. In a Consolidated Order dated June 26, 2013, the Superintendent, among other decisions, declined to vacate the subpoena issued to Anthem; enforced with modifications subpoenas issued to MaineHealth, a competitor of Petitioner CMHC, and to two hospitals, and quashed duplicative subpoenas, i.e. those seeking multiple witnesses from the same entity. R. 2:2423-28.

On June 21, 2013, the Intervenor Petitioners filed an Objection and Request to Amend the Procedural Order and also an Objection to Protective Order and Request to Amend the Protective Order. R.2:2344, 2352. Anthem filed an objection to both of the Intervenor Petitioners' filings. R. 2: 2345-49.

16

The Intervenor Petitioners' objection to the Procedural Order asserted that the Superintendent's schedule for the proceeding was "too contracted for the Intervenors to meaningfully and effectively conduct discovery on the adequacy of the proposed Network[,] to prepare their testimony, or to prepare for the hearing." R. 2:2344. It sought additional time for discovery, and for the pre-filing of testimony and exhibits, and sought to delay the hearing.

In response, by Order dated June 25, 2013, the Superintendent extended the deadline for pre-filing testimony and exhibits but otherwise denied the Intervenor Petitioners' request, citing the impact of delaying the hearing itself and also the Intervenor Petitioners' own delay in initiating discovery. R. 2:2350-51.

The Intervenor Petitioners' Objection to Protective Order was "on the basis that [the Protective Order] continues to withhold documents from public disclosure. . . . Failure to make these documents available to the Intervenors and the limitation on their use at hearing . . . has made it incredibly difficult for the Intervenors . . ." R. 2:2352.

The Superintendent responded in an Order dated June 25, 2013, granting the Intervenor Petitioners' request to the extent of changing the designation for some materials from "attorneys' eyes only" to "confidential," thereby enabling Intervenor Petitioners' counsel to share the material with those with whom they were working to prepare. R. 2:2353-54. In other respects, the Superintendent denied the Objection. *Id.*

Also on June 21, 2013, the Superintendent supplemented the Notice of Pending Proceeding and Hearing by issuing a Notice of Public Comment Session, setting a public comment period for 5:30 p.m. June 28. R. 2:2355.

On June 24, 2013, the Intervenor Petitioners filed a Notice of Claim Pursuant to 5 M.R.S. § 9063, alleging bias on the part of the Superintendent. R. 2432-33. Section

17

9063 provides, in pertinent part: "Upon the filing in good faith by a party of a timely charge of bias or of personal or financial interest, direct or indirect, of a presiding officer or agency member in the proceeding requesting that that person disqualify himself, that person shall determine the matter as a part of the record." 5 M.R.S. § 9063(1).

The claim of bias arose from a comment by the Superintendent's counsel in another proceeding initiated by the non-Intervenor Petitioners other than Robert Kimball. *Central Maine Healthcare Corp. v. Bureau of Insurance*, Ken. Super. Ct., Docket No. AUGSC-AP-13-23 (now docketed in the Maine Business and Consumer Court as Docket No. BCD-AP-13-03). The Notice of Claim quoted the Bureau's counsel as saying in court June 19, 2013, "The Superintendent's view is that there should be more than one plan in the exchange." R. 2:2432. The Intervenor Petitioners' Notice alleged that the Superintendent's counsel's comment "strongly suggests that the Superintendent has prejudged the ultimate issue in this proceeding, because if Anthem's proposed plan is not approved, there will be only one plan in the exchange." R. 2:2432.

The Superintendent responded with an Order rejecting the claim of bias on the same date. R. 2434-35. Treating the Intervenor Petitioners' Notice of Claim as a motion to disqualify him, the Superintendent declined to recuse, but acknowledged that "I believe it is in the public interest for Anthem to offer some type of health plan on Maine's exchange." R. 2:2434. The Order noted that "Maine consumers would not be well served" if there were only one plan on the exchange only because the State "ran out of time" to approve a second plan. *Id.* The Order pointed out that "the reason I have expedited this proceeding is to account for the possibility that Anthem's proposed network is *not* compliant with Maine's access standards," and to afford an opportunity for any deficiencies to be corrected. *Id.* (emphasis in original). "If this proceeding were

18

the rubber stamp that [the Intervenor Petitioners] allege[], there would have been no need to build in extra time to allow for Anthem to potentially resubmit its access plan." *Id.* In "reject[ing] any charge of bias, direct or indirect, in this proceeding," the Superintendent's Order noted that, "While I have restructured these proceedings to ensure that Anthem has a reasonable opportunity to come up with a state-law compliant plan, I have no intention of approving any plan that does not provide the access to health care services required by Maine law, even if it means fewer plans on Maine's exchange." R. 2:2435.

On June 25, 2014, the Superintendent directed that Anthem's managed care accessibility analyses filed with its access plan filing be made public, leaving 39 pages of Anthem's original access plan filing still designated as "attorneys' eyes only." The 39 pages consisted of provider contracts that the Superintendent determined were entitled to be withheld based on Anthem's trade secret claim.

On June 27, 2013, the Intervenor-Petitioners filed Intervenors' Procedural Objections and Offer of Proof, in response to the Superintendent's procedural orders up to that point. R. 2:2448-50. Their objections focused on the continued withholding of some of Anthem's filing; on the Superintendent's refusal to enforce some of the Intervenor Petitioners' discovery requests and subpoenas for hearing, as well as on the "unreasonably contracted schedule" for the entire proceeding, all allegedly in violation of the Maine Administrative Procedure Act, the Maine Bureau of Insurance rules of practice, and the Intervenor Petitioners' right to due process. *Id.* Their offer of proof indicated that, had the Intervenor Petitioners been permitted to obtain the evidence they had sought to subpoena, they could establish that MaineHealth, a competitor of CMHC, rather than Anthem, had designed Anthem's proposed network, and had done

19

so based on MaineHealth's own interests rather than based on subscriber needs or standards for assuring adequate access to services. R. 2:2449-50.

D. The Hearing

The evidentiary hearing commenced, as scheduled, on June 28.

On Anthem's motion, the Superintendent admitted into evidence an updated version of Anthem's entire Access Plan. In addition, Anthem moved to admit the pre-filed testimony of two witnesses, Colin McHugh, Anthem's Regional Vice President of Provider Engagement and Contracting, and William Whitmore, Anthem's Regional Vice President of Underwriting. However, based on objections by the Intervenor Petitioners, the Superintendent struck as irrelevant certain portions of testimony discussing Anthem's business reasons for "narrowing" or downsizing its provider network. (R. 2:2601 & n.9.)

The hearing focused largely on the adequacy of Anthem's proposed access plan for the Guided Access HMO products. The Intervenor Petitioners challenged adequacy on multiple fronts, including the accuracy of the Anthem's provider lists and the sufficiency of Anthem's accessibility analyses. The Intervenor Petitioners offered three witnesses affiliated with the provider Petitioners. (R. 5:6/28 Tr. 213; *see also* R. 2:2208 ¶ 16.) As noted above, the Intervenor Petitioners had caused 12 subpoenas to be issued for individuals and entities to give testimony at the hearing, and some of the subpoenas were upheld against motions to quash them. However, the Intervenor Petitioners did not question any of those whom it had caused to be subpoena'ed. R. 5:6/28:224:15-16.

At the close of the June 28 hearing, the Superintendent requested that Anthem provide updated provider lists that indicating which practices would accept new patients

20

and also whether the provider was already under contract with Anthem or was being "aspirationally" included in the network lists. R. 5:6/28:237-240. During the public comment period at the end of the day, six non-party members of the public testified. R. 5:6/28:263-277.

On June 30, Anthem filed with the Superintendent revisions to its access plan exhibits along with a written submission titled Anthem's Response to Hearing Request, explaining the revisions. R. 2:2463–67, R. 3C:4377–4644. Anthem's supplemental filing stated that the physicians and hospitals in Anthem's proposed network "will take all new patients that are covered by the products that use the proposed network." R. 2:2466. It also included updated patient:provider ratios for PCPs and high volume specialists, reflecting only minor changes from those originally filed. R. 2:2465. Anthem's filing also included complete provider networks (including multiple provider addresses, where applicable) for the Guided Access HMO and Guided Access POS products. R. 3C:4377-5104 (Anthem Exs. 9 and 10).

Upon reviewing Anthem's revised submission, the Superintendent determined that a second day of hearing was necessary. On July 1, 2013, the Superintendent issued an Order to Reconvene the Hearing on July 2, 2013 for the purpose of enabling Anthem's June 30 filings to become part of the hearing record, and to allow direct and cross-examination of an Anthem witness regarding those filings. R. 2:2468.

On July 2, 2013, the Intervenor Petitioners filed a written objection to the Order Reconvening the Hearing and reasserted their claim of bias pursuant to 5 M.R.S. § 9063. R. 2:2469.

At the July 2 hearing, the Superintendent overruled the renewed objections of the Intervenor Petitioners, in which other intervenors had by then joined. R. 5:7/2:6-7.

21

Thereafter, on direct examination by Anthem, Anthem's witness provided a detailed explanation of the steps that he had taken to revise Anthem's filings, and other parties were given the opportunity to cross-examine. R. 5:7/2:8–28. At the end of the July 2 hearing, the Superintendent closed the record, and set deadlines for the parties to submit post-hearing briefs. R. 5:7/2:68.

On July 16, 2013, after the parties had submitted post-hearing briefs, the Superintendent issued an Order To Re-Open The Record For The Limited Purpose Of Taking Official Notice, citing as authority for his action Insurance Rule 350(19)(C). R. 2:2514. The areas on which the July 16 Order re-opened the record for purposes of official notice related to a Harvard Pilgrim Health Care filing; the provider network data for another Anthem product, the BlueChoice PPO small group plan, and the fact that Anthem's BlueChoice PPO small group plan includes "a typical, broad network that has been approved by the Superintendent." *Id.*

On July 18, 2013, Intervenors filed a written objection to the proposed re-opening of the record on several grounds: that the Order To Re-Open was insufficiently specific on what information from the two identified sources the Superintendent was proposed to consider, and that subject matter covered by the Order To Re-Open was not an appropriate use of official notice. R. 2:2515-17.

E. The Superintendent's Decision and Amended Decision

On July 25, 2013, the Superintendent issued his Decision and Order, finding that the proposed Anthem Network provided "reasonable access to medical services" for subscribers and, approved the Anthem Guided Access HMO and POS products, subject to specified conditions. R. 2:2551-2581. The Superintendent issued an Amended Decision and Order ["Amended Decision"] on August 6, 2013, repeating the same

22

ultimate finding and approvals, again with conditions. R. 2:2582-2643. The stated purpose of the Amended Decision was to correct an error in the original Decision and Order involving a particular specialty in one county. R. 2:2582 n.1, 2:2600-01.

The first sections of the Superintendent's 62-page Amended Decision cover the procedural history of Anthem's application for approval of its Guided Access HMO and POS products to the point of hearing. R. 2:2584-2602. The Amended Decision explains the governing legal framework, which primarily rests on the provisions of 24-A M.R.S. §4303(1) and Insurance Rule 850(7). R. 2:2603-07.

The section of the Amended Decision and Order titled *Analysis, Findings, and Conclusions* includes a detailed discussion of the record evidence and explains the Superintendent's ultimate finding and conclusion that Anthem's proposed access plans for the Guided Access products comply with the requirements of section 4303(1) and Insurance Rule 850(7). The Superintendent's analysis is discussed in more detail below.

Based on the analysis, the Amended Decision and Order identified 14 separate conditions that Anthem would be required to satisfy in order for its proposed Guided Access HMO "narrow network" to be deemed capable of providing reasonable access to health care services for purposes of the applicable insurance statute and rule. R. 2:2641-42. The Superintendent approved Anthem's access plan for the Guided Access HMO products subject to those conditions. *Id.*

In a section titled *Matters Yet to be Considered*, the Superintendent also explicitly flagged an issue not subsumed in the Amended Decision and Order, arising "from the fact that Anthem is proposing to move large numbers of current members . . . into these new HMO products. In order to move its current membership into these new products, Anthem has to demonstrate not only that the new products meet basic standards for

23

reasonable access, but also that moving members from broad-network products into narrow-network products will be "in the best interests of the policyholders." 24-A M.R.S. 2850-B(G)(3)(b)." R. 2:2640.

The Amended Decision and Order states:

Simply because I am permitting Anthem to offer these narrow-network plans for sale in Maine does not necessarily mean I will also permit Anthem to move its current customer base into these plans. . . . I will shortly be issuing a Notice of Hearing, scheduling a hearing on the latter question for September 9, 2013. To demonstrate that these proposed HMO plans are in the best interests of their current policyholders, Anthem will have to demonstrate that, for current members, the reduced choice in these new plans is offset by a corresponding benefit, presumably in the form of lower rates than what members would otherwise pay.

R. 2:2641.

F. Stay Request and Appeal

On August 16, 2013, the Intervenor Petitioners requested that the Superintendent stay his approval,. R. 2644-2650. The request was denied in an Order on Stay issued August 27, 2013. R. 2:2651-53.

The Petition for Judicial Review of Final Agency Action in this case was timely filed on September 3, 2013.

III. *Analysis*

A.    Standard of Review

In an appeal of a final agency action under M.R. Civ. P. 80C and 5 M.R.S. § 11007(C) (2012), the court reviews an agency's decision "for error of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Goodrich v. Me Pub. Emps. Ret. Sys.*, 2012 ME 95, ¶6, 48 A.3d 212. The Board's decision may also be reversed if it was in excess of statutory authority, or was made upon unlawful procedure. 5 M.R.S.§ 11007(C)(1)-(3).

24

The court will "not attempt to second-guess the agency on matters falling within its realm of expertise" and judicial review is limited to "determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering, Inc. v. Sup't of Ins.*, 593 A.2d 1050, 1053 (Me. 1991). The party seeking to vacate the agency's decision has the burden of proving the agency's decision is clearly erroneous. *Douglas v. Bd. of Trs. of the Me. State Ret. Sys.*, 669 A.2d 177, 179 (Me. 1996).

The appellant seeking judicial reversal of an agency's fact-finding determination assumes a significant burden. A court will not overturn the agency's fact-finding unless the party seeking to overturn the agency's decision demonstrates that the administrative record compels a contrary result "to the exclusion of any other inference." *Id.* at 179. The court must affirm findings of fact if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551, 555. A court is not entitled to substitute its judgment for that of the agency, "merely because the evidence could give rise to more than one result." *Dodd v. Sec. of State*, 526 A.2d 583, 584 (Me. 1987). Rather, the court may consider only whether "the agency's decision is supported by substantial evidence on the whole record." *Id.*

This standard requires the party seeking to overturn an agency decision to prove there is no competent evidence in the record to support [the agency's] decision." *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 14, 989 A.2d 1128. Conversely, if any competent evidence supports the agency's findings, its decision must be upheld "even if the record contains inconsistent evidence." *Id.* at ¶ 13, 989 A.2d 1128. Furthermore, the credibility determination of witnesses is in the exclusive province of

the agency and should not be disturbed on appeal. *See Sprague Elec. Co. v. Me. Unemp't Ins. Comm'n*, 544 A.2d 728, 732 (Me. 1988).

With respect to interpretation, a court will interpret a statute according to its plain meaning, without examining legislative history or giving deference to the Board's construction. *Whitney v. Wal-Mart Stores, Inc.*, 2006 ME 37, ¶¶ 22-23, 895 A.2d 309; *Dombkowski v. Ferland*, 2006 ME 24, ¶22, 893 A.2d 599 (holding that a court's ultimate objective when interpreting a statute is to "effectuate the intent of the Legislature, which is ordinarily gleaned from the plain language of the statute"). In doing so, a court will consider the language in the context of the whole statutory scheme and construe the statute to avoid absurd, illogical, or unreasonable results." *FPL Energy Me. Hydro LLC*, ¶ 12, 926 A.2d 1197.

B    Issues Presented

The Petitioners have briefed the following grounds for appeal, listed here in the order in which they appear in Petitioners' brief on appeal:

- bias on the part of the decision maker, based specifically on the Superintendent's announced view that it would be preferable for more than one QHP to be available to Maine consumers on the ACA exchange for plan, including Anthem's proposed Guided Access products if they qualified for approval under Maine law. However, Petitioners' claim that the Superintendent's conduct of the proceeding in its entirety also reflected bias.

- the Superintendent's denial of the request for stay made by the non-Intervenor Petitioners

- the alleged insufficiency of the notice given by the Superintendent, in light of the notice requirements of the Maine APA, 5 M.R.S. § 9052

- the Superintendent's alleged violation of the "official notice" provisions of the Maine APA

- the Superintendent's alleged denial of discovery to the Intervenor Petitioners

- erroneous evidentiary rulings by the Superintendent during the hearing

26

- errors of law relating to the Superintendent's reliance on "member" ratios in determining network adequacy; the alleged improper allocation of the burden of persuasion on availability of hospital services, and interpretation of "reasonable access" as it relates to access to tertiary care hospital services.

- findings not supported by substantial evidence in the record regarding access to hospital services and specialty physician services, and regarding the capacity of participating hospitals and participating PCPs

Because the Petitioners' assertion of bias encompasses the Superintendent's conduct of the entire proceeding, all of their other arguments are more or less incorporated by reference within their bias argument. Accordingly, this Decision and Order addresses the bias issue last, but otherwise covers the issues in the order just listed.

C.    Denial of Request for Stay

For two reasons, the court upholds the Superintendent's denial of the request for stay made by the non-Intervenor Petitioners.

One ground for upholding the denial of the Motion for Stay is based on the movants' lack of standing. As noted in the Superintendent's denial order, the movants did not seek leave to intervene, and thus, as non-parties to the proceeding, lacked standing to seek a stay or postponement. The Motion For Stay contends that the movant non-Intervenor Petitioners were unable to determine whether they should intervene because, as of the date of the Motion, the Superintendent was withholding most of Anthem's application as confidential. R. 2:2209. If the non-Intervenor Petitioners indeed had no meaningful opportunity to intervene, due process considerations might trump the absence of standing. However, the record does not indicate such to be the case.

27

The Superintendent's June 12 deadline for intervention was not an absolute deadline; the Notice allowed for petitions to intervene filed after the deadline to be granted upon a showing of "good cause," R. 2:2167, later clarified to be a "compelling showing of good cause." R. 2:2180. The non-Intervenor Petitioners did not seek leave to intervene at any time, including after the Superintendent lifted the confidentiality restriction from most of Anthem's filing.

The fact that some of the Petitioners, including two affiliate hospitals of non-Intervenor Petitioner CMHC, did choose to intervene, and the further fact that the same attorney signed and filed the Petition to Intervene on behalf of the Intervenor Petitioners the day before signing and filing the Motion for Stay on behalf of the non-Intervenor Petitioners, *see* R. 2:2203, 2209, compel the inference that the non-Intervenor Petitioners made a calculated choice to file their Motion for Stay instead of joining in the Petition to Intervene.

The other ground for upholding the Superintendent's denial of the Motion for Stay is that the record demonstrates the decision to be a reasonable exercise of the Superintendent's discretion, in light of what he clearly understood to be a very limited timeframe within which to consider Anthem's application for approval of its Guided Access products.

The Superintendent's denial decision points out that the Motion for Stay was actually a request for continuance, there being no final agency action to be stayed. R. 2:2213. To the extent the Motion for Stay also was sought to extend various deadlines, including the deadline for requests to intervene, it could also be viewed as a motion for enlargement of time.

28

Given that Anthem's network access filing was made barely two months before what the Superintendent understood to be the federal deadline for state action on QHP applications, that granting the non-Intervenor Petitioners' Motion for Stay would have imperiled, if not eliminated, the Superintendent's ability to review and act on Anthem's application by the deadline.

It seems clear that the timing of Anthem's network access filing put everyone—the Bureau of Insurance, the Petitioners, the healthcare community, the public, and Anthem itself, as the party bearing the burden on the ultimate issue—in a difficult position.[6] Although Petitioners have questioned whether the Superintendent's review of Anthem's application in fact had to be completed by July 31, 2013 in order for Anthem's Guided Access products to have any chance of being certified by CMS and included in the ACA exchange for Maine, nothing in the record suggests that the Superintendent was mistaken in his understanding that "[t]he federal government has set July 31, 2013 as the deadline for state recommendations for federal certification of Qualified Health Plans." R. 2:2211.

Thus, the Superintendent had essentially three options in dealing with Anthem's application for approval of its proposed Guided Access HMO and POS networks. The two options that would enable Anthem's application to be acted upon by the July 31 deadline were for the Superintendent either to act on the application without convening

---

[6] The record is silent on why Anthem's network access filing was filed when it was. Petitioners' suspicion that Anthem delayed its filing in order to avoid public scrutiny finds some support in Anthem's initial insistence that its entire network access filing, even the existence of the cover letter, be withheld from public knowledge. On the other hand, other factors suggest that Anthem's filing was not made later than it could have been. Anthem's filing obviously was the product of a massive and sustained effort to assemble an adequate network; Anthem's filing had to be revised during the proceeding, and Anthem, as the applicant, had more to lose than any other party to the proceeding if time ran out before the Superintendent could act on Anthem's application.

a hearing or proceeding under the Maine APA, or to convene and complete such a proceeding on an radically compressed schedule.

The Superintendent's third option—the one that the Motion For Stay sought-- was to ignore the CMS deadline and conduct a review process on a significantly more extended and less compressed schedule. Such a schedule risked defeating the entire purpose of the proceeding because it would delay action on Anthem's proposed products beyond the CMS deadline.

Thus, the Superintendent's decision to convene a hearing on a schedule that could enable him to act on Anthem's application by the July 31 deadline represents a middle path that balanced the benefit to the public interest of an public and adversarial test of Anthem's filing against the benefit to the public interest of allowing a second potential plan to go through the approval process in time to qualify for the exchange if it passed muster.

The Superintendent's choice of the middle path more or less necessitated denying the non-Intervenor Petitioners' Motion For Stay as well as adopting the compressed schedule for the proceeding about which other Petitioners—those that did intervene-complain.

Under Insurance Rule 350(13)(G) and also by law, requests for continuance or enlargement of a Bureau proceeding are addressed to the Superintendent's discretion. Judicial review of an agency's denial of a request to continue is for abuse of discretion. *See Waxler v. Maine Real Estate Comm'n,* 1998 ME 65, ¶ 4, 708 A.2d 663; *Magno v. Town of Freeport,* 486 A.2d 137, 140 (Me. 1985). Under the circumstances, the

Superintendent's denial of the non-Intervenor Petitioners' Motion for Stay was well within his discretion.[7]

## D. Sufficiency of Notice

Petitioners challenge the sufficiency of the notice provided by the Superintendent under the Maine Administrative Procedure Act.

The Act contains two distinct notice provisions—one addressing notice to persons "whose legal, rights, duties or privileges" are at issue in the proceeding, and the other covering notice to the public of proceedings involving issues of "substantial public interest."

The former provision requires that notice be provided "to the person or persons whose legal rights, duties or privileges are at issue, by regular mail, sufficiently in advance of the anticipated time of the decision to afford an adequate opportunity to prepare and submit evidence and argument, and to request a hearing if so desired." 5 M.R.S. § 9052(1)(A). The latter provision requires that notice be given, "in any proceeding deemed by the Agency to involve a determination of issues of substantial public interest, to the public sufficiently in advance of the anticipated time of the decision to afford interested persons of adequate opportunity to prepare and submit evidence and argument, and to request a hearing if so desired." Id. § 9052(1)(B).

Petitioners assert that "[t]he Superintendent committed errors of law by failing to provide proper Maine Administrative Procedure[] Act notice both to persons whose legal rights, duties or privileges were at issue and to the general public." Petitioners' Brief at 17.

Their brief frames the operative question as follows:

---

[7] The same analysis applies to the Superintendent's denial of a similar motion filed by York Hospital, which is not a party to this appeal. See R. 2:2216-19.

Here, the question is whether the Bureau's issuance on June 6, 2013 of a Notice of Proceeding and Hearing setting a deadline for intervention of 3:00 p.m. on June 12, 2013 and setting a hearing date for June 28, 2013, where several documents explaining the contours of the application and accordingly the intervention rights of non-parties, sufficiently apprised interested parties and the public of the nature of the matter and of their potential rights to intervene.

Petitioners' Brief at 18.

With regard to section 9052(1)(A), requiring notice by regular mail to persons "whose legal rights, duties or privileges are at issue," the Petitioners assert that "[t]here are many individuals whose 'legal rights, duties and privileges' were at issue in this matter," without identifying who those individuals are. *See* Petitioners' Brief at 18-19. However, the court is not persuaded that any of the Petitioners was entitled to regular mail notice of the "narrow network" access proceeding under section 9052(1)(A). Beyond the right to participate or to request leave to intervene enjoyed by any member the public, the provider Petitioners have not shown that they have any right or privilege to be included in Anthem's proposed Guided Access HMO "narrow network." Similarly, the non-provider Petitioners have not shown that they have any right or privilege to have their preferred provider hospitals or physicians included in the Guided Access HMO network. In short, none of the Petitioners has demonstrated standing to assert that they were entitled to receive notice of the proceeding, as "persons whose legal rights, duties or privileges are at issue, by regular mail . . ." for purposes of section 9052(1)(A) of the Maine APA.

Accordingly, the court's sufficiency of notice analysis focuses on section 9052(1)(B), which addresses notice to the public.

The Maine APA does not mandate any particular lead-time for notice to interested parties or the public. Section 9052(4) does specify the contents of an agency's

32

notice, but Petitioners do not assert that the Superintendent's Notice lacked any of these formal requisites.[8] Thus, their claim distills essentially to a due process claim. The due process standard regarding notice is functionally similar to the statutory standard in the Maine APA. *See Guarantee Trust Life Ins. Co. v. Sup't of Insurance*, 2013 ME 102, ¶ 35, 82 A.3d 121 ("Due process requires that a party to an administrative action be on notice as to the statutory provisions and issues involved in an adjudicatory proceeding sufficient to provide an opportunity to adequately prepare and present evidence"). *See also Berry v. Me. Pub. Utils. Comm'n*, 394 A.2d 790, 793 n.4 (Me.1978).

In considering challenges to the sufficiency of notice generally, the Law Court has applied a flexible approach to the timing of notice, *cf. Crispin v. Town of Scarborough*, 1999 ME 112, ¶¶ 26-27, 736 A.2d 241 (one-day notice of meeting sufficient under Freedom of Access Law), and has focused on actual prejudice or harm to the party claiming insufficiency of notice. *See Antler's Inn & Restaurant, LLC v. Dep't of Pub. Safety*, 2012 ME 143, ¶ 12, 60 A.3d 1248 ("Were we to address the notice issue on its merits, we would hold that the deficiencies in the Department's notice constitute harmless error in the circumstances presented by this case").

The general rule is that "[o]ne who appears in an administrative proceeding without the notice to which he is entitled by law has no grounds to complain of lack of notice. " *Kovack v. Licensing Bd. of City of Waterville*, 173 A.2d 554, 559-60 (Me. 1961).

---

[8] Section 9052(4) does require a notice to contain "six pieces of information: (1) the legal and jurisdictional authority for the proceeding, (2) the statute or rule involved, (3) the nature and purpose of the proceeding and "the matters asserted," (4) the time and place of the hearing, (5) how evidence and argument can be submitted to the agency, and (6) how a person may intervene in the proceedings." Antler's Inn & Restaurant, LLC v. Dep't of Pub. Safety, 2012 ME 143, ¶ 10, 60 A.3d 1248, citing 5 M.R.S. § 9052(4). Petitioners do not assert that the Notice as published by the Superintendent lacked any of the six.

Here, some of the Petitioners did intervene and fully participated in the hearing, so any deficiency in the Superintendent's Notice or the publication thereof is harmless as to them. Other Petitioners did not intervene. Although the non-Intervenor Petitioners claim that their failure to intervene was the result of not knowing whether they should intervene or not, the fact that some of the Intervenor Petitioners are affiliates of some of the non-Intervenor Petitioners, and the fact that the same attorney signed the Intervenor Petitioners' request to intervene a day after signing the Motion for Stay filed by the non-Intervenor Petitioners, compel the inference that the non-Intervenor Petitioners who moved for a stay could have intervened but did not.

Moreover, as noted above, the June 12 deadline by to intervene was not insuperable, if a compelling showing of good cause were made. As of June 18, the provider lists were made public. For those reasons, the court concludes that the Intervenor Petitioners and those of the non-Intervenor Petitioners who joined the Motion for Stay have not shown any due process issue, and that any deficiency in the timing of publication of the Superintendent's Notice was harmless error as to them.

The only other named Petitioner, Robert Kimball, neither intervened nor moved for a stay. (Nor did the Petitioners identified as John Doe and Jane Roe). He did not appear at the public hearing, despite having about two weeks from the publication of the Notice to prepare for and attend the hearing.

As Anthem's brief points out, the record is silent as to whether Mr. Kimball (and the Doe/Roe Petitioners) received actual notice of the public hearing. Lack of actual notice does not render notice deficient. In other words, to comply with section 9052(1)(B) and the requirements of due process, the Notice did not have actually to come to the attention of every member of the public, every health care provider, every

34

Anthem subscriber or every person who might purchase one of the approved QHPs on the ACA exchange for Maine.

As to Petitioners' contention that the confidential status of Anthem's filing precluded them from meaningful participation, the Superintendent made Anthem's proposed "narrow network" and provider lists public effective June 18, 2014, ten days before the hearing. No requests to intervene were received after June 18, and the public hearing attracted a small number of speakers, including several of the Petitioners.

For all of these reasons, this court concludes that the Notice of Pending Proceeding and Hearing was sufficient, both in its form and in its manner of publication, for purposes of the Maine APA and due process, and that the Petitioners' challenge based on insufficiency of notice must be denied.

E. The Alleged Violation of 5 M.R.S. § 9058, Regarding "Official Notice"

The Petitioners allege that the Superintendent violated 5 M.R.S. § 9058 by taking official notice in his Amended Decision of a Harvard Pilgrim Health Care (HPHC) report filed with the Bureau of Insurance; the provider network data for another Anthem product, the BlueChoice PPO small group plan, and the fact that Anthem's BlueChoice PPO small group plan includes "a typical, broad network that has been approved by the Superintendent."

Section 9058 of Maine Administrative Procedures Act at provides that:

agencies may take official notice of any facts of which judicial notice could be taken, and in addition may take official notice of general, technical or scientific matters within their specialized knowledge and of statutes, regulations and non-confidential agency records. Parties shall be notified of the materials so noticed, and they shall be afforded an opportunity to contest the substance or materiality of the facts noticed.

In an Order To Reopen the Record For the Limited Purpose of Taking Official Notice dated July 16, 2013, the Superintendent notified the parties of the material of

which he intended to take official notice. R. 2:2514.[9] The Order provided specific internet URLs for the HPFC filing and for the BlueChoice PPO small group plan provider network. *See id.* It also afforded the parties a limited opportunity "to contest the substance or materiality of the matters identified." *Id.*

In response to the Order, the Intervenor Petitioners filed a Request for Clarification and Opposition to Order to Reopen The Record and To Take Official Notice. R. 2:2515. Their primary objections were that the HPHC and Anthem materials cited in the Superintendent's Order To Reopen were private party information and data rather than data developed by the Bureau, and also that the Order To Reopen was not sufficiently specific as to what particular data the Superintendent intended to rely upon from among "the thousands of data points" within the HPHC and Anthem materials. *See id.*

In his Amended Decision, the Superintendent ruled that he would take official notice of the HPHC report and the Anthem BlueChoice PPO provider network, as well as of the premise that Anthem's BlueChoice PPO "includes a typical, broad network that has been approved by the Superintendent." R. 2:2602 (Amended Decision at 21). In a footnote, the Superintendent explained how the three noticed matters figured in his analysis:

> Official notice of Anthem's existing BlueChoice PPO provider network does not constitute a finding by the Superintendent that the provider directory is accurate. The BlueChoice provider directory is subject to the same concerns that were raised on the record regarding Anthem's proposed 2014 HMO provider directory. Official notice is taken, rather, for the limited purpose of illustrating the "broad" network to which the proposed "narrow" network has been implicitly compared by all parties to this proceeding. Likewise, HPHC's Rule 945 report has not been audited, and is admitted for the limited purpose of

---

[9] The HPHC and BlueChoice materials referred to in the Order To Reopen were marked as Superintendent's Exhibits 1 and 2 and appear in the record in Binder 3E. R. 3E:5271-5867.

providing a public record that reports the enrollment in Dirigo Choice, which was introduced by intervenor testimony but not quantified."

R. 2:2602 (Amended Decision at 21 n.10).

Later in the Amended Decision, the Superintendent cited to the HPHC filing to support a finding about enrollment in Dirigo Health, *see* R. 2:2617-18 (Amended Decision at 36-37 & n.25), a statistic he deemed relevant, among others, in projecting likely individual enrollment in Anthem's Guided Access HMO products. *See id.* The Superintendent utilized the BlueChoice PPO plan in the course of evaluating the adequacy of Anthem's proposed Guided Network HMO provider network specifically as it relates to pediatric services for Sagadahoc and Androscoggin counties. *See* R. 2:2622 (Amended Decision at 41 & n.28). It was because the original Decision misinterpreted the BlueChoice PPO data as it pertained to in-network pediatricians for Sagadahoc County that the Superintendent had to issue the Amended Decision. *See* R. 2:2582 (Amended Decision at 1 n.1).

In their brief on appeal, the Petitioners summarize their objection to the Superintendent's taking of official notice as follows:

> [B]ecause the noticed documents were not those on which it was permitted to take notice, and because the order setting forth the documents to be noticed was not sufficiently specific, the Superintendent's re-opening and taking notice of these items violated 5 M.R.S. §9058 and was an error of law.

Petitioners' Brief at 21.

The court's view is that the Superintendent could take official notice of the HPHC report and BlueChoice network data. Section 9058 confers broad discretion on an agency, and the HPHC report and the Anthem data are well within the scope of the "general, technical or scientific matters within [the Bureau of Insurance's] specialized knowledge" for purposes of section 9058.

37

However, this court agrees with the Petitioners that the Superintendent erred in failing to specify the particular information contained in the HPHC report and the BlueChoice PPO provider network of which he intended to take official notice. As to the BlueChoice PPO material, the Order To Reopen the Record For the Limited Purpose of Taking Official Notice did indicate that the Superintendent intended to take notice that the BlueChoice PPO reflects "a typical, broad network that has been approved," R. 2:2524, but the Order said nothing about why the HPHC report was being singled out, or what within the report would be made the subject of official notice.

The purpose of the section 9058 requirement of notice and opportunity to contest is to afford the parties a meaningful opportunity to contest the particular facts or information that the agency proposes to make the subject of official notice. As a federal court has aptly observed,

> When courts allow agencies, as we do, wide latitude in taking official notice, it is essential that the parties be afforded an opportunity to present information which might bear upon the propriety of noticing the fact, or upon the truth of the matter to be noticed. Banks v. Schweiker, 654 F.2d 637, 641 (9th Cir.1981) (quoting C. McCormick, Law of Evidence § 333 at 771 (2d ed. 1972)). *See also* Carson Products Co. v. Califano, 594 F.2d 453, 459 (5th Cir.1979) ("It is a fundamental proposition of administrative law that interested parties must have an effective chance to respond to crucial facts."). Such fairness concerns appear to have motivated the drafters of Federal Rule of Evidence 201(e), which provides litigants in federal court with just such an opportunity to rebut judicially noticed facts. *See* Fed.R.Evid. 201, Notes of Advisory Committee on 1972 Proposed Rules ("Basic considerations of procedural fairness demand an opportunity to be heard on the propriety of taking notice"). We note, finally, that not to allow petitioners an opportunity to rebut noticed facts would sanction the creation of an unregulated back door through which unrebuttable, non-record evidence could be introduced . . . outside of the statutorily-mandated hearing context.

*Kaczmarczyk v. INS,* 933 F.2d 588 (7th Cir.), *cert. denied,* 502 U.S. 981(1991) (internal quotes and ellipses omitted).

38

The Superintendent's Order To Reopen was vague and general to the point of failing to afford any of the parties a meaningful opportunity to contest the accuracy of the information.

On the other hand, the Petitioners' objection avails them naught. Now that the Decision and Amended Decision have revealed precisely how the Superintendent has relied on the HPHC and BlueChoice materials, the Petitioners do not challenge the accuracy of the information of which official notice was actually taken in the decision. Moreover, the findings in the Amended Decision that are supported by the HPHC and BlueChoice PPO material are not essential to the outcome. Accordingly, because the error of which the Petitioners complain is harmless, it does not advance their appeal.

F. Alleged Denial of Discovery

Petitioners assert that the Superintendent erred in sustaining some of Anthem's objections to the Intervenor Petitioners' discovery requests. *See* Petitioners' Brief at 21-22. The Superintendent's action is reflected in his Order On Anthem's Objections to Intervenors' First Information Request. R. 2:2316-21.

Although the Petitioners' objection to the Superintendent's discovery order is broadly phrased, the only specific area of discovery alluded to in Petitioners' Brief has to do with their "discovery including communications among Anthem's employees regarding the development of the geographic access plan ." Petitioners' Brief at 22. Accordingly, the court limits its focus to that area. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290 (issues not addressed in a more than perfunctory manner on appeal are waived).

In fact, the Superintendent's Order did require Anthem to respond to the portions of Requests 3 and 4 of the Intervenor Petitioners' First Information Request

39

relating to communications within Anthem about geographic access to providers and geographic distribution of providers. *See* R. 2:2317-18. However, the Superintendent sustained Anthem's objection to a request for information about how individual providers were selected for the Guided Access HMO network on the ground that the individual selection process was irrelevant to the ultimate issue in the proceeding—adequacy of the network. *See id.*

Overall, the Superintendent's discovery order reflects a detailed, selective approach rather than the broad-brush denial of discovery implied by the Petitioners. Of the 21 numbered requests, the Superintendent upheld Anthem's objection in full to only three.

Moreover, the Intervenor Petitioners have not substantiated their assertion that the Superintendent's rulings during the hearing were contrary to his rulings on discovery. At the inception of the first day, the Intervenor Petitioners objected to portions of Anthem's prefiled testimony on the ground that it covered issues that they were precluded from exploring in discovery. *See* R. 2:6/28:13, 15-16, 20-21. The Superintendent took the objections under advisement, indicating that they would be addressed in his decision. *See* R. 2:6/28:25. The Amended Decision largely sustains the Intervenor Petitioners' Objections. *See* R. 2:2601 (Amended Decision at 20 & n.9).

An agency's discovery determinations are reviewed "with great deference" for abuse of discretion. *McAdam v. United Parcel Service*, 2001 ME 4, ¶ 34, 763 A.2d 1173. The Petitioners have not demonstrated any abuse of discretion in the Superintendent's discovery determinations during the proceeding.

## G. Challenged Evidentiary Rulings

Petitioners also challenge evidentiary rulings by the Superintendent during the hearing. Petitioners' Brief at 23-24.

Section 9057 of the Maine APA prescribes the general rule for the admission of evidence in a state agency proceeding: "Evidence shall be admitted if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs." 5 M.R.S. § 9057(2). The same section specifically says that "agencies need not observe the rules of evidence observed by courts." *Id.* § 9057(1).

Petitioners' objections to evidentiary rulings mainly assert that the Superintendent improperly admitted testimony and exhibits for which insufficient foundation had been established. "As a result, those who actually created exhibits could in effect testify through the exhibits without being sworn and subject to cross-examination." Petitioners' Brief at 24. When the Superintendent responded to Petitioners' foundational objections by inviting Anthem to lay a foundation, Petitioners objected to that as well, claiming Anthem should be limited to its prefiled testimony. *See* R. 5:6/28:26.

In addition to the Maine APA incorporating a comparatively liberal evidentiary standard, it confers upon the agency broad discretion in deciding what evidence to admit. The Superintendent's decision to allow Anthem to elicit foundational testimony in response to the Intervenor Petitioners' foundational objections was well within his discretion. A party need not anticipate in its prefiled testimony every objection that might be made.

As the Bureau's brief points out, the Petitioners' foundational objection became largely mooted when it turned out that Anthem had filed an incorrect Guided Access

41

HMO network provider list as a June 28 hearing exhibit, and was directed to replace it with an updated and correct list. *See* R. 5:6/28:237-40. *See also* R. 2:2464, 2468.

Petitioners have not shown that the Superintendent's Amended Decision should be overturned or otherwise affected by any of the Superintendent's evidentiary rulings during the hearing.

H. Alleged Errors Of Law Relating To The Superintendent's Reliance On "Member" Ratios In Determining Network Adequacy; The Alleged Improper Allocation Of The Burden Of Persuasion On Availability Of Hospital Services, And Interpretation Of "Reasonable Access" As It Relates To Access To Tertiary Care Hospital Services.

Petitioners claim that the Superintendent's Amended Decision includes three errors of law.

(i) The Alleged Error of Law Involving "Member Ratios" and Network Capacity

First, they assert that the Superintendent improperly relied on "member ratios" in determining the adequacy—specifically, the capacity—of Anthem's proposed Guided Access HMO networks. Their argument can be summarized as follows:

> Anthem maintained that so long as the ratio of projected members in the new plans to the number of participating providers were below a certain threshold, then the plan provides "reasonable access to medical services". Specifically, Anthem contended that a ratio of less than 2,000 members to 1 primary care physician; and less than 6,000 members to 1 specialty physician is sufficient to show reasonable access. R. 2611. The Superintendent, in his decision, accepted the Anthem analysis, but modified the ratios to 500:1 for PCP's and 1500:1 for specialty physicians. R. 2618-19. But, the Superintendent still relied upon the concept of comparing the number of projected members to the number of participating physicians. Id. This is an error of law. . . .It was established at the hearing that none of the participating providers will be treating only members of these plans. R. Binder 5, 59-64, 160. . . . The real issue is what capacity each physician has to take on additional patients who would be shifted to the excluded providers. Simply looking at the number of new members, and a ratio to the number of participating providers, does not answer the question as to whether there will be "reasonable access".

> Petitioners' Brief at 25-26.

42

In his Amended Decision, the Superintendent addressed the Intervenor Petitioners' argument directly: "The intervenors have noted that providers do not exclusively serve Anthem patients, so their true capacity is understated. This is true, but the argument cuts both ways, because for the same reasons, it is likely that if Anthem takes on a significant number of new members, many of them will be seeing the same providers with Anthem that they were already seeing before they enrolled in Anthem." R. 2:2557 (Decision at 37); 2:2619 (Amended Decision at 38).

The Superintendent's determination whether Anthem's proposed Guided Access HMO met the "reasonable access to medical services" standard, *see* 24-A M.R.S. § 4303(1); 02-031 C.M.R. ch. 850, § 7(A), involved a highly complex and somewhat subjective evaluation of multiple variables, including:

- the number of persons likely to be enrolled in the Anthem Guided Access HMO plans in various geographical areas

- the extent to which Anthem's proposed provider network would afford reasonable access to prospective enrollees for various types of medical services

- the number of providers in the network; the nature of services offered by the providers, and the providers' capacity to meet the demand for services associated with the Anthem Guided Access HMO plans

As the Decision and Amended Decision illustrate, the "reasonable access" calculus required the Superintendent to evaluate the proposed network across the spectrum of medical services in each of the counties in which the Guided Access HMO plans were to be offered.

As noted above, *see* Section II(D), *supra* at 21, the Anthem's supplemental filing stated that the physicians and hospitals in Anthem's proposed network "will take all new patients that are covered by the products that use the proposed network." R. 2:2466. Rather than relying solely on this evidence of capacity, the Superintendent

43



took several additional steps to address the uncertainties associated with projecting enrollment and assessing provider capacity to handle projected enrollment.

He decided that Anthem's enrollment projections, which were based largely on its own enrollment statistics and experience, did not sufficiently account for the possibility of a massive influx of people who were previously uninsured and thus would not have been counted in any enrollment statistics. R. 2:2554-56 (Decision at 34-36); 2:2616-18 (Amended Decision at 35-37). He quintupled Anthem's projection of enrollment in the Guided Access HMO plans from about 40,000 to 200,000. R. 2:2556 (Decision at 36); 2:2618 (Amended Decision at 37).

That step necessitated a correlative adjustment in the patient:provider ratios used to determine network adequacy. Anthem's filing assumed patient:provider ratios of 2000:1 for PCPs, consistent with Bureau of Insurance Rule 850, and 6000:1 for specialists. *See* R. 3A:2658-59 (table of provider to member ratios). Rule 850 requires "carriers that offer managed care plans utilizing primary care providers [to] maintain a minimum ratio of one full-time equivalent primary care provider to 2000 enrollees." *See* 02-031 C.M.R. ch. 850, § 7(B)(1). The 2000:1 PCP:patient ratio necessarily incorporates generic assumptions about a PCP's capacity to handle patients. Rule 850 does not set specific ratios for specialists.

To help assure adequate network capacity for all potential enrollees in the Anthem Guide Access HMO plans, the Superintendent reduced Anthem's proposed ratios for PCPs and specialists by a factor of 4 for purposes of determining network capacity, using ratios of 500:1 for PCPs and 1500:1 for specialists. R. 2:2556-57 (Decision at 36-37); 2:2618-19 (Amended Decision at 37-38). Because the 2000:1 ratio for PCPs in Rule 850 necessarily incorporates generic capacity assumptions, reducing

44

that ratio by a factor of 4 could reasonably be expected to result in substantially more network capacity per enrollee.

In addition, during the June 28 hearing, the Superintendent required Anthem to supplement its initial filing with further information about its provider network. *See* R. 2:2468 (Order To Reconvene Hearing). Anthem's responsive supplemental filing included data indicating which individual PCPs were accepting new patients. See R. 2:2464-67 (Anthem filing); 3C:4169-4376 (Anthem Ex. 8). *See also* 2:2608-09 (Amended Decision at 27-28). It also described commitments from various hospitals to serve patients. R. 2:2466-67.

Although Anthem's provider:patient ratios were well within the 2000:1 and 6000:1 ratios it was proposing for PCPs and specialists, the Superintendent's application of the lower 500:1 and 1500:1 ratios meant that providers needed to be added to Anthem's network in certain specialties and in certain geographic areas. *See* R. 2621-30 (Amended Decision at 40-49). As a result, the Amended Decision imposed a variety of conditions aimed at assuring capacity consistent with the ratios. *See id. See also* R. 2:2641-42 (Amended Decision at 60-61). The conditions of approval, the Superintendent imposed on Anthem various monitoring and reporting requirements intended to assure that capacity did not become an issue.

The Superintendent concluded: "With these conditions, I find that the 4:1 'worst-case' adjustment provides a sufficient safety margin that no additional adjustment to the basic ratio analysis is necessary." R. 2:2621 (Amended Decision at 40). The Superintendent's utilization of significantly more conservative member ratios in assessing network adequacy, coupled with evidence of capacity in the record and the

45

conditions of approval, are amply sufficient to support his conclusion that, in terms of capacity, the proposed network afforded "reasonable access."

Although the Petitioners characterize the Superintendent's use and application of "member ratios" as an error of law, the court sees it as an evidentiary determination, in that the Superintendent was essentially deciding which data to use and how to apply the data to some aspects of the network access issue. In effect, Petitioners assert that the Superintendent should have required Anthem to obtain or estimate available capacity information from every PCP and specialist. The Superintendent's implicit decision that the data was not necessary in light of other evidence in the record and his ability to require monitoring and reporting was not a legal judgment but a decision on which evidence to apply and what weight to give it.

(ii) The Allocation of the Burden of Persuasion on Availability of Hospital Services Issue

The Petitioners' second claimed error of law is that the Superintendent improperly shifted the burden of persuasion off Anthem and onto the intervenor hospitals with regard to availability of hospital services. Their argument is as follows:

> In his decision, the Superintendent stated that the Intervenor hospitals (other than CMMC) had failed to present " . . . evidence that they provided particular services that their in-network competitors did not." R. 2634. As a matter of law, and as stated on the record of the proceeding, the burden of proof on the issue of "reasonable access to medical services" was on Anthem, the applicant, not on the Intervenors. In response to the Intervenors pointing out that Anthem had failed to present any evidence as to the availability of hospital services in its application or at the hearing, the Superintendent shifted the burden of proof to the Intervenors to demonstrate the lack of reasonable access. That was an error of law.

Petitioners' Brief at 27.

The pertinent portion of the Superintendent's Amended Decision provides clarifying context:

46

Anthem's proposed HMO network includes a tertiary care hospital, Maine Medical Center, which provides the full panoply of hospital services. As for the remaining community hospitals [in the proposed network] it is sufficient for purposes of § 4303(1) analysis that such hospitals, in order to be licensed by the State, are required by law to provide certain core medical services. Notably, while four different community hospitals intervened in this proceeding, none presented evidence that they provided particular services that their in-network competitors did not.

R. 2:2634 (Amended Decision at 53) (citation and ellipses omitted).

With the benefit of context, it is clear that the Superintendent's Amended Decision did not place the burden of persuasion on the availability of hospital services on anyone but Anthem. The just-quoted passage recites the evidence that Anthem presented toward meeting its burden to demonstrate availability of hospital services. The passage plainly indicates that the Superintendent inferred, from the fact that the community hospitals in Anthem's proposed network were all State-licensed, that they offered the services required for licensure as community hospitals. The Superintendent's comment about the intervenor community hospitals simply points out that they did not attempt to rebut Anthem's showing of availability by showing that they offer services beyond the those offered by the community hospitals in Anthem's proposed network.

Petitioners have not shown any error of law in this regard.

(iii) Alleged Error of Law in Interpretation Of "Reasonable Access" As It Relates      To Access To Tertiary Care Hospital Services.

Petitioners' third assignment of error relates to the Superintendent's analysis of "reasonable access" to Maine's three tertiary care hospitals. Their argument in pertinent part is as follows:

The Superintendent found that there are only three tertiary care hospitals in Maine: Eastern Maine Medical Center in Bangor; Maine Medical Center in Portland; and Central Maine Medical Center in Lewiston. The Superintendent found that the plan that excluded CMMC would provide "reasonable access" to

47

tertiary care hospital services to members residing in Androscoggin, Oxford and Franklin counties, stating that " . . . it is not unreasonable for a provider network to include one tertiary care hospital to serve the southern portion of the state, just as only one such hospital serves the larger northern portion of the state." To find that the members residing in Androscoggin, Franklin and Oxford counties who currently have access to a tertiary care medical center in Lewiston, should be required to travel to Portland, because people who live in Aroostook County have to travel to Bangor, is arbitrary, capricious, and inconsistent with a statutory command that a plan provide "reasonable access."

Petitioners' Brief at 27.

The Superintendent's Amended Decision noted that Maine Medical Center and CMMC are within 40 miles of each other, whereas the State's third tertiary hospital, Eastern Maine Medical Center in Bangor, is more than 100 miles from either of the other hospitals, and is "the closest tertiary hospital for a region of the state considerably larger than the region that would be served by Maine Medical Center in the proposed network." R. 2:2633 (Amended Decision at 52).

In rejecting the Intervenor Petitioners' argument, the Superintendent noted, "The question is not how the proposed HMO network compares to a hypothetical network including every hospital in Maine. It is whether the proposed HMO network contains enough providers over a wide enough area to provide reasonable access to health care services to members. If the access provided is reasonable, it is irrelevant that the network could be bigger or better." *Id.*

The tertiary hospital access issue presented to the Superintendent, squarely stated, was whether it was reasonable for participants in the Guided Access HMO plan to obtain tertiary care at a hospital up to 40 miles farther away than another tertiary care hospital.[10] In essence, the Petitioners' argument on this issue boils down to the

---

[10] Logic dictates that, if Central Maine Medical Center is 40 miles from Maine Medical Center, only people coming to Maine Medical Center from beyond CMMC have to travel a full 40 miles farther. For everyone else, the difference in travel distance is less.

proposition that it is unreasonable to require enrollees to travel up to 40 miles farther for tertiary care. In deciding what is reasonable, the Superintendent could legitimately consider travel distance to tertiary care elsewhere in Maine, or even outside Maine.

Petitioners have not shown an error of law or arbitrary or capricious action on the part of the Superintendent.

I. Alleged Lack Of Substantial Evidence To Support Findings Regarding Access To Hospital Services And Specialty Physician Services, And Regarding The Capacity Of Participating Hospitals And Participating PCPs

There is considerable overlap between Petitioners' claims of errors of law and their claims regarding lack of substantial evidence.

(i) Evidence Regarding Access to Hospital Services

Petitioners assert that Anthem failed to present sufficient evidence regarding access to hospital services, and therefore that the Superintendent's findings are not based on substantial evidence in the record. They also repeat their objection to the Superintendent's finding that Anthem's proposed network provided "reasonable access" to tertiary care, this time in terms of lack of substantial evidence.

Access and availability are related concepts, but availability might well be considered an element of access, along with capacity and geographic proximity. Because Petitioners raise the capacity issue in a separate argument, this Decision on Appeal frames the present issue in terms of availability of services and geographic proximity.

In terms of geographic proximity, Anthem presented evidence that its proposed network included at least one hospital in every county in the Guided Access HMO plan except for Sagadahoc County, which does not have any hospitals. R. 3A:2659-60 (prefiled testimony of Colin McHugh). With regard to the availability of services at the hospitals in Anthem's proposed HMO network, the Superintendent relied largely on

49

direct evidence of services offered at Maine Medical, and inferred from the fact of licensure that the community hospitals in the proposed network offered the hospital services required for such licensure. R. 2:2634 (Amended Decision at 53). Likewise, the Superintendent's analysis of the proposed network in terms of access to tertiary care has already been addressed in detail above. *See* Section H.(iii), *supra* at 47. His ultimate conclusion—that access to Maine Medical Center represented reasonable access to tertiary care for the residents of the southern Maine counties covered by Guided Access HMO plan—was well supported in the evidence.

The Superintendent's findings that Anthem's proposed network, assuming the conditions of approval were met, afforded reasonable access to community hospitals and tertiary care are supported by substantial evidence in the record.

Petitioners' argument regarding specialty medical services is not developed in detail in their brief or reply brief. However, it should be noted that the Superintendent's use of reduced specialty patient:provider ratios, his detailed assessment of the evidence by specialty and by county, and the combination of conditions he imposed in the Amended Decision all are amply sufficient to support his conclusion as to specialists.

(ii) Evidence Regarding Capacity for Hospital Services, Specialist Services and PCP Services

As they did with access issues, the Petitioners are essentially making the same arguments about capacity issues in the substantial evidence context that they did in the context of errors of law. The Petitioners' objection is that Anthem did not submit actual numbers or estimates on the capacity of the hospital and individual providers in Anthem's proposed network.

As noted above in the discussion of the Petitioners' "member ratios" argument, the Superintendent applied "worst case" member ratios in deciding whether the number

50

of providers in Anthem's proposed network would afford "reasonable access." *See* Section H(i), *supra* at 42. The Superintendent's determination that Anthem's proposed network, with the conditions of approval, would provide sufficient capacity to support a finding of "reasonable access" is supported by substantial evidence in the record.

J. Claim of Bias On The Part of The Superintendent

The Petitioners' claim of bias is based both on statements made by the Superintendent and on his conduct of the entire proceeding:

> Petitioners assert that the Superintendent, the fact finder and decision maker in this administrative proceeding, had pre-judged and pre-determined that Anthem's application should be approved, and conducted the hearing in a manner to assure that the Anthem application would be approved, such that the right to an unbiased and impartial proceeding were denied to the intervening and non-Intervenor Petitioners. This included the entire process from the unreasonably contracted proceeding to reopening the record after briefs were submitted to fill gaps in Anthem's case.

Petitioners' Brief at 11-12.

A party asserting bias on the part of an administrative agency decision maker "must present evidence sufficient to overcome a presumption that the fact-finders, as state administrators, acted in good faith." *Friends of Maine's Mountains v. Bd. of Envtl. Prot.*, 2013 ME 25, ¶23, 61 A.3d 689, *citing Mallinckrodt LLC v. Littell,* 616 F.Supp.2d 128, 142 (D. Me. 2009) *and Mutton Hill Estates, Inc. v. Town of Oakland,* 468 A.2d 989, 991 (Me. 1983). Each of the two alleged areas of bias—the statements and the conduct of the proceeding—will be addressed separately.

(i) Superintendent's Statements

Initially through his counsel in another court case involving some of the Petitioners, and later in his own words, the Superintendent indicated his view that it is in the public interest for there to be more than one plan offered on the ACA exchange for Maine. Since only two carriers had sought approval from the Maine Bureau of

51

Insurance, the Superintendent had to be referring to Anthem's plan. In fact, his Order on the Intervening Petitioner's Notice of Claim of bias, which the Superintendent interpreted as a motion to disqualify, notes, "I believe it is in the public interest for Anthem to offer some type of health plan on Maine's exchange." R. 2:2434.

However, the Order in its entirety makes it clear that "some type of health plan" did not necessarily mean the plan Anthem was proposing. As the Order on bias itself pointed out, the expedited schedule (to which the Petitioners also objected) had as its very purpose to enable the Superintendent to reject Anthem's proposed network and yet enable "some type of health plan" to be offered on the exchange. *Id.* 2:2434-35.

The Petitioners' argument conflates an endorsement of there being two plans on the exchange with an endorsement of the network Anthem was proposing. The issue before the Superintendent in the proceeding was not whether there should be two plans on the ACA exchange for Maine, but whether the "narrow network" proposed by Anthem satisfied the statutory requirement of "reasonable access." To make that distinction clear, the Superintendent's Order on bias also notes, "I have no intention of approving any plan that does not provide the access to health care services required by Maine law, even if it means fewer plans on Maine's exchange." R. 2:2435.

In fact, the Superintendent did not approve Anthem's plan as it was originally filed. Anthem was required to revise its filing, and even then the approval granted was subject to multiple conditions.

Moreover, the Superintendent's view that it would be in the public interest for there to be more than one plan on the ACA exchange for Maine is consistent with the provisions of the Maine Insurance Code that reflect a legislative preference for active competition among insurers. For example, section 4303 of title 24-A—the same

52

section that contains the network access standard—prohibits, with limited exceptions, "most favored nation" clauses in insurer-provider contracts, because such provisions usually operate to limit competition. *See also* 24-A M.R.S. § 3480 (superintendent cannot approve merger plan among mutual insurers if it would "materially tend to lessen competition in the insurance business in this State".

The Superintendent's view favoring choice for consumers is not a ground for disqualifying him as a decision maker on whether a carrier's proposed provider network should be approved.

(ii) Conduct of the Proceeding

The Petitioners' argument on the Superintendent's bias in the conduct of the proceeding is based on much the same set of issues discussed in previous sections of this Decision On Appeal:

> [T]he Superintendent issued a series of procedural, discovery, and evidentiary rulings, before, during, and after the hearing, which had the cumulative and overwhelming effect of favoring Anthem and restricting the Intervenors' ability to effectively participate in the proceeding.

Petitioners' Brief at 14.

Thus, most of the actions of the Superintendent that the Petitioners assert show bias have been discussed previously herein, but a few merit revisitation in this context.

What the Petitioners refer to as the "unreasonably contracted proceeding" was the result of the limited time between Anthem's filing and the federal deadline. What this Decision On Appeal has termed the Superintendent's "middle path," *see* Section C, *supra* at 30—meaning the approach that balanced the need for an expeditious decision one way or the other against the public interest in the subject matter—could be traversed only if the Superintendent, in his discretion, chose to convene a formal proceeding, but set very tight dates and deadlines.

Another complaint of the Petitioners is that the Superintendent permitted Anthem to supplement its application and prefiled testimony. Such actions were well within the Superintendent's discretion. The implied premise in Petitioners' argument is that the Superintendent was required to approve or reject Anthem's application as filed, and could not allow Anthem to present foundational or rebuttal evidence in response to the Intervenor Petitioners' and other intervenors' objections and presentations. That premise is simply not the law.

The reopening of the record of which the Petitioners also complain was within the Superintendent's discretion as well. The matters as to which the Superintendent reopened the record—the HPHC report and Blue Choice network material—were not critical to the Superintendent's decision and were neutral, rather than adverse, to the Petitioners' position and therefore their inclusion in the record does not at all demonstrate bias. *See* Section E., *supra* at 39.

The Petitioners' view that the Superintendent's bias extended to "the entire process" can be explained by the basic conflict in goals. Whereas the Superintendent's overall goal was to act on Anthem's application by the July 31 federal deadline, the record compels an inference that the Petitioners' overall goal was the exact opposite. Thus, what the Petitioners characterize as "a series of procedural, discovery, and evidentiary rulings, before, during, and after the hearing, which had the cumulative and overwhelming effect of favoring Anthem" can instead be deemed rulings made to enable the Superintendent to act by the deadline. The fact that the Superintendent conducted the proceeding so as to be able to render a decision by the federal deadline does not suffice to show bias.

54

## IV. *Conclusion*

The Petitioners' grounds of appeal do not justify vacating or otherwise modifying the Superintendent's Amended Decision approving Anthem's proposed Guided Access HMO "narrow network". Accordingly, it is hereby ORDERED AND ADJUDGED as follows:

1. The appeal of Petitioners is denied.

2. The Amended Decision of the Superintendent dated August 2, 2013 in the Maine Bureau of Insurance proceeding docketed as INS-13-801 is hereby affirmed.

3. The Order On Stay dated August 27, 2013 is hereby affirmed.

4. Judgment shall be entered for Respondents.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Decision On Appeal by reference in the docket.

Dated April 11, 2014

A. M. Horton
Justice, Business & Consumer Court

Entered on the Docket: 4.11.14
Copies sent via Mail __ Electronically ✓

Robert L. Kimball, Bridgton Hospital, Rumford Hospital, Maureen Harpell, N.P., Albert Aniel, M.D., David Salko, M.D., Brenda Weeks, Julie Rioux, Lisa Pease, Central Maine Healthcare Corporation, Central Maine Medical Center, Dieter Kreckel, M.D., Alan Verrill, M.D., William Lee, M.D., Daniel Trafford, and John Doe and Mary Roe, unknown individuals,

v.

Superintendent of Insurance and Bureau of Insurance, Department of Professional and Financial Regulation, State of Maine

BCD-AP-13-05

Robert L. Kimball, Bridgton Hospital, Rumford Hospital, Maureen Harpell, N.P., Albert Aniel, M.D., David Salko, M.D., Brenda Weeks, Julie Rioux, Lisa Pease, Central Maine Healthcare Corporation, Central Maine Medical Center, Dieter Kreckel, M.D., Alan Verrill, M.D., William Lee, M.D., Daniel Trafford, and John Doe and Mary Roe, unknown individuals,
     Petitioners

    Counsel:               Michael Poulin, Esq.
                            Skelton Taintor & Abbott
                            95 Main Street
                            Auburn, ME 04210

Superintendent of Insurance and Bureau of Insurance Department of Professional and Financial Regulation
     Respondents

    Counsel:               Jonathan R Bolton, AAG.
                            Office of the Attorney General
                            6 State House Station
                            Augusta, ME 04333

Anthem Health Plans of Maine
     Participating Party

    Counsel:               Christopher T. Roach, Esq.
                            Roach Ruprecht Sanchez & Bischoff PC
                            66 Pearl Street, Suite 200
                            Portland, ME 04101